IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

EMILE GREYWOODE,    )
            )
   Plaintiff,    )
            )  CASE NO. 2:12-cv-0004-MEF
v.           )   (WO – Publish)
            )
SCIENCE APPLICATIONS  )
INTERNATIONAL CORPORATION, )
            )
   Defendant.   )

## MEMORANDUM OPINION AND ORDER

Plaintiff Emile Greywoode ("Plaintiff" or "Greywoode") brings this lawsuit, alleging claims of race and national origin discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981. Specifically, Greywoode alleges that his former employer, Defendant Science Applications International Corporation ("Defendant" or "SAIC"), subjected him to a "hostile and disrespectful" work environment based on his race (black) and his national origin (Sierra Leone, Africa), discriminated against him on these bases by disciplining him and ultimately terminating his employment, and also terminated him in retaliation for making complaints about discourteous and discriminatory treatment he was receiving from white co-workers.

Now before the Court is Defendant's Motion for Summary Judgment (Doc. #21), which was filed on October 29, 2012. Having reviewed the submissions of the parties and the record as a whole, the Court finds that, for the reasons explained below, Defendant's motion is due to be GRANTED IN PART and DENIED IN PART.

# I.  JURISDICTION AND VENUE

This Court has subject matter jurisdiction over the claims in this action under 28 U.S.C. §§ 1331 and 1343.  The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations in support of both.

# II.  STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact."  *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof.  *Id.* at 322–23.

Once the moving party has met its burden, the non-moving party must "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  To avoid summary judgment, the non-moving party "must do more than simply

show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a district court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  After the non-moving party has responded to the motion for summary judgment, the district court must grant summary judgment if there is no genuine dispute of material fact and the moving party is entitled to a judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

### III.  FACTS

The Court has carefully considered the submissions of the parties in support of and in opposition to the motion.  The submissions of the parties, when viewed in the light most favorable to Greywoode, the non-moving party, establish the following material facts:

**A.      Overview of Greywoode's Employment with SAIC and the SFMIS Team**

SAIC is a scientific, engineering, and technology applications and software company that provides various products and services to government and commercial customers.  On September 15, 2006, Greywoode was hired by T.J. Nola ("Nola") to work as a senior software engineer on SAIC's Security Forces Management Information Systems ("SFMIS") team in Montgomery, Alabama.  In connection with his employment, Greywoode received an ethics manual and was also made aware of SAIC's anti-harassment and discrimination policies.

The SAIC team members with whom Greywoode worked during the majority of his

employment[1] were: Venkat Paruchuri ("Paruchuri") (Indian), senior software engineer; Madan Shah ("Shah") (Indian), senior software engineering and technical lead; James Caskey[2] ("Caskey") (white), database administrator; Trish Gober ("Gober") (white), site manager; Michael Ivison ("Ivison") (white), system engineer and functional lead; Asa Padgett ("Padgett") (black), system administrator; Trish Silva ("Silva") (white), test manager[3] and engineer; and Mark Jozwiak ("Jozwiak") (white), system engineer and functional lead.[4]  Greywoode was the only member of the SFMIS from Africa.

During the majority of his employment with SAIC, Greywoode's immediate supervisors were Shah and Gober.  Shah oversaw the technical aspects of Greywoode's employment, while Gober handled personnel matters.[5]  Neither Ivison nor Caskey were Greywoode's supervisors.  Throughout his employment with SAIC, Greywoode worked in the position of senior software engineer; however, in early 2009, Greywoode was made lead Java programmer by Gober.  Greywoode's employment with SAIC was terminated for poor

---

[1]  During Greywoode's employment, there were at least two other SAIC team members who departed: Terri Cedrone ("Cedrone") (white), and Michael Nunnally ("Nunnally") (white).  Cedrone was terminated by Gober for performance problems, and Nunnally resigned due to performance-related problems and the inability to meet customer demands.

[2]  Notably, during the relevant time period, Caskey was a subcontractor and not a SAIC employee.

[3]  Silva testified that Gober made the decision to promote her to test manager.

[4]  Mykal Lesure (black) also worked with the SAIC team as a summer intern and was eventually made a permanent employee shortly before Greywoode's termination.  Although unclear from the record, it also appears that another black female, Joyce Latson, may have worked or interned with the SFMIS team for a short period of time during Greywoode's employment .

[5]  Gober became Greywoode's supervisor in June 2007 when she replaced Nola.

work performance on July 15, 2009.

**B.      Greywoode's Allegations of Harassment and Discrimination**

During Greywoode's employment with SAIC, there were various interpersonal conflicts among the SFMIS team members, leading to very poor morale.   Greywoode contends that these conflicts were more than mere work "disagreements."   Indeed, Greywoode claims that he was harassed and discriminated against because of his race and national origin and that he was further retaliated against through written discipline and eventual termination for complaining about harassment and discrimination.

To support his claims, Greywoode points the Court to several instances of harassing[6] or discriminatory conduct.

**1.      The "Aspect Ratio" Comments**

In early 2007, Greywoode complained to Nola that Ivison was constantly objecting to Greywoode's use of a certain aspect ratio in one of his designs.   Greywoode considered Ivison's critique to be harassment because Ivison was not a software engineer, and therefore, was not qualified to critique his work or to oppose one of his engineering decisions.   After Greywoode complained to Nola, Ivison's critique of his use of aspect ratio immediately stopped.

---

[6] Greywoode testified in his deposition that the only incidents of "harassing" conduct he could recall were Ivison's "aspect ratio" comments and his calling Greywoode's work "atrocious." The remainder of Greywoode's complaints are for what he summarily describes as "bias or discrimination" — "I don't believe I can classify it as harassing[.]"   (Doc. #23-A.)   Moreover, Ivison's aspect ratio comments and his calling Greywoode's work "atrocious" were the only examples Greywoode could recall of Ivison criticizing his work.   (Doc. #23-A.)

### 2.      The "Atrocious" Comment

In May 2009, Ivison shouted at Greywoode during a team meeting and called his work "atrocious."   Immediately after the meeting ended, Gober told Ivison to apologize to Greywoode, which he did.  This is the only incident where Ivison called Greywoode's work "atrocious."

### 3.      Tasks Assignments

After Ivison became responsible for preparing the team members' work assignments, Greywoode complained that he was being given too much report construction and not the Java development tasks he desired to help him "learn the application" and become an asset to the company.  Ivison instead assigned the Java tasks to Shah and Ronald Buchanan ("Buchanan),[7] another SFMIS engineer.  It is undisputed that Shah and Buchanan had more experience than Greywoode in applying Java to the application at the time the assignments were made.  After complaining to Shah, Ivison, and Gober about the tasks he was receiving, Greywoode was given more opportunities to perform Java programming and was later made lead Java programmer by Gober in early 2009.

In the spring of 2008, Greywoode also complained to Ivison that he did not assign Greywoode sufficient tasks on an OPM project that provided additional remuneration above his salary.  The majority of these tasks went to Paruchuri and Shah because Greywoode was already behind on his regular work, which affected the schedule.   Moreover, the

---

[7] Buchanan had left the SFMIS team by 2009.

programmers who were assigned a larger portion of these tasks were fast programmers and had the time to accommodate extra work.  After complaining, Greywoode asked Ivison to change the assignments, but Ivison refused.  Greywoode then complained to Shah, who increased his OPM assignments.  Greywoode received additional remuneration for this work.

### 4.   Office Assignments

Greywoode, who worked in a shared office,[8] was "bypassed" for a private office on two occasions.  The first instance was when Caskey moved into a private office shortly after beginning his employment with SAIC.  Greywoode believed he should have received this office based on seniority.  However, Caskey, who was database administrator, moved into the office that was occupied by the previous database administrator.  Caskey also asked Shah if he could move into that office, and Shah agreed.  After Caskey moved and learned that Greywoode had taken offense, Caskey offered Greywoode his private office, but Greywoode declined because he preferred the window in his office (the office that Caskey moved into did not have a window).

The second incident involved Silva moving into a vacant private office in August 2008.  Greywoode mistakenly believed that Caskey was responsible for this assignment because he saw Caskey preparing this office for Silva, but Caskey was not responsible for making this office assignment.  Neither was Ivison.  Gober instead made this office

---

[8]  This office housed two workers, Greywoode and whomever else was assigned to share office space with him.  It does not appear that Greywoode ever changed offices during his employment with SAIC.

assignment based on functional factors to keep the three developers (Shah, Paruchuri, and Greywoode) physically close to one another and to keep testing (Silva) independent of the software development.[9]  Greywoode also never told Gober that he wanted this office.

### 5.  The Topaz Signature Card Comments

Greywoode complained to Shah that Caskey was criticizing his design on the Topaz Signature Card project.  Greywoode told Shah that he "made a design decision based on good judgement and the requirement and the options, best option for the application."  (Doc. #23-A.)  As with Ivison's criticisms of Greywoode's use of the aspect ratio, Greywoode considered Caskey's criticism to be harassment because Caskey was a database administrator, and therefore, was not qualified to comment on or to challenge design decisions made by a software engineer.  After complaining to Shah, Caskey's critiques of Greywoode's work on the Topaz Signature card project ceased.

### 6.  Caskey's Communication Methods

Greywoode complained to Caskey that Caskey spoke to him in a rude and disrespectful manner.  Specifically, Greywoode complained that Caskey would "raise his voice" and "talk sharply."  Greywoode also complained that Caskey sent him a hostile and disrespectful email in which Caskey did not address Greywoode by his name and capitalized the words "SOMEONE ELSE" and "THEY."[10]  (Ex. 2, Doc. #23-A.)  Caskey apologized to

---

[9]  There is also no evidence that Greywoode ever told Gober that he wanted to move into the private office that eventually went to Silva.

[10]  Greywoode could not recall receiving any other emails from Casey that used all-caps in what he considered to be an inappropriate manner.  Greywoode also could not identify the specific

Greywoode[11] and told him he would try to "do better."  Gober later asked Greywoode if everything was okay between he and Caskey, and Greywoode again complained about Caskey's discourteous behavior.  Gober told Greywoode she would talk to Caskey and see if improvement could be made.

### 7.    Parking Lot Confrontation

Sometime in the spring of 2009, after a customer meeting with Caskey, Ivison, and Greywoode, among other team members, in attendance, Caskey approached Greywoode in the parking lot and demanded to know what Greywoode had been muttering during the meeting.  Greywoode told Caskey to leave him alone, but claims that Caskey "kept on." Greywoode "got annoyed" and shouted "strongly" at Caskey to leave him alone.  Greywoode could not remember what, if anything, he was "muttering" during the meeting.  However, Silva, who was also present at the customer meeting, testified that Caskey and Ivison were whispering to each other, and Greywoode said "gossip, gossip, gossip," while gesturing a mouth opening and closing with his hand.

### 8.    Mimicking Accent

Ivison made fun of the way Greywoode talked.  However, this conduct never occurred in Greywoode's presence, and Greywoode has no personal knowledge of what Ivison said

---

words use by Caskey that he considered to be discourteous or disrespectful; instead, Greywoode testified it is "[t]he tone and hostility and so on is what we are talking about."  (Doc. #23-A.)

[11] Greywoode admitted that he also apologized to Caskey for using the word "us" in this same email chain.  (Doc. #23-A.)

or did to make fun of the way he talked.[12]  Indeed, Greywoode did not learn of this conduct until after his termination when he contacted Cedrone, who had previously been terminated by Gober for poor performance.

### 9.    Other Harassing or Discriminatory Conduct

Greywoode claims that Gober discriminated against him by giving Caskey a lead position.  Gober gave this position to Caskey because he had more experience with customer relations.  Greywoode asked Gober to provide him with more opportunities to gain similar experience, which she did.  Gober arranged for Greywoode to take management courses and eventually made him lead Java programmer in early 2009.

Greywoode also claims that, after the June 2009 team assessment, Gober discriminated against him by "bringing up memos that were not factual, discrediting my work, putting me on performance improvement plan and all the other things that she did up to the point that I was terminated." (Doc. #23-A.)  Greywoode could provide no specific details for this claim other than describing Gober's conduct as not "quite right."[13] (Doc. #23-A.)

### C.    Greywoode's Complaints

Greywoode made several complaints throughout his employment with SAIC.  As

---

[12]  Ivison, on the other hand, testified that he sometimes joked with Caskey, Jozwiak, and probably Shah about Greywoode asking at corporate events if something (food or drink) was "free," mimicking Greywoode's accent as they joked.

[13]  Several other members of the team, however, testified that Gober often tried to placate and protect Greywoode and that they felt he received preferential treatment because of his race.

noted above, in early 2007, Greywoode complained to Nola that Ivison was constantly objecting to Greywoode's use of a certain aspect ratio in his designs; after Greywoode complained, Ivison's critiques stopped.  Greywoode further complained to Shah, Ivison, and Gober that Ivison was not giving him the type of programming tasks he desired; after complaining, Greywoode was given more opportunities to perform Java programming and was made lead Java programmer by Gober in early 2009.  Greywoode complained to Ivison and Shah about tasks assignments on an OPM project; after Greywoode complained to Shah, he was given more of this work.  Greywoode also complained to Shah that Caskey was criticizing his design on the Topaz Signature Card project; after complaining, Caskey's critiques stopped.  Finally, Greywoode complained directly to Caskey about the manner in which Caskey communicated with him, which Greywoode considered to be discourteous and disrespectful; Caskey eventually apologized and said he would try to "do better."

In late April 2009, Greywoode complained to Gober that neither Ivison nor Caskey had improved their behavior towards him, and Greywoode reiterated his complaints about office assignments, tasks assignments, design criticisms, the parking lot incident, and comments on Greywoode's work on the Topaz Signature Card project.  Shortly thereafter, on April 29, 2009, during a meeting with Gober and Caskey, Greywoode submitted a "formal" written complaint to Gober concerning Caskey's behavior towards him. Greywoode stated that Caskey "needlessly opposes [him], works against [him] and is still discourteous," and he outlined two specific complaints: (1) Caskey's criticisms of

Greywoode's design work on the Topaz Signature Card project;[14] and (2) Silva moving into a private office that Greywoode believed he should have received based on seniority. (Ex. 2, Doc. #23-A.) Gober met with the entire SFMIS team after this complaint to allow them to discuss their issues.[15]  The next day, Gober held a meeting between Caskey and Greywoode to discuss these issues. According to Greywoode, Gober "scolded" Caskey,[16] and Caskey testified that they were given directions to work better as a team. Caskey apologized to Greywoode for coming across as discourteous and disrespectful, as that was not his intention. At Greywoode's request, Caskey gave Greywoode database tasks that would help him learn new development skills. At the end of the meeting, Caskey offered to shake Greywoode's hand, but Greywoode refused.  Gober concluded the meeting, and Caskey left with his tears in his eyes. After making his "formal" complaint, Greywoode did not receive any hostile or discriminatory treatment from Caskey.

---

[14] Greywoode testified that he remained in charge of the Topaz Signature Card project even after making his "formal" complaint to Gober.

[15] At this meeting, Gober testified that she told the team:

[T]o be professional.  We needed to focus on work and not on personalities and that if there was no reason to come back with a comment or something that was derogatory, that it didn't need to happen.  I told this to [sic] the entire team.  I told them we needed to sort through the issues and make sure —we were a little specific. We went into more specific discussions.  I remember Mark [Jozwiak] actually took the lead and made a comment about how the office was—I don't remember his exact term.  It was something like toxic.  It was a toxic environment.  And we discussed how to clear the air there.

(Doc. #23-B.)

[16] Caskey received a low marking from Gober on his 2009 annual performance evaluation for the communication problems he had with Greywoode.

Notably, Greywoode never used the term "discrimination" in his written or oral complaints until after his termination. Gober does not recall Greywoode complaining to her specifically about discrimination, although Shah testified that Gober told him that Greywoode's discrimination complaint was the reason for the June 2009 team assessment. Although never the subject of a complaint, Greywoode testified in his deposition that Ivison asked him "are you going to call the Revered Al Sharpton to come to your rescue?" This is the only example provided by Greywoode of a comment made to him that he believed referenced his race or national origin.

## D.    The June 2009 Assessment

Given the conflicts among the SFMIS team members, Gober requested assistance from human resources around June 5, 2009.[17] SAIC sent Teri Lee ("Lee"), human resources

---

[17]  Gober was concerned that Greywoode's performance deterioration and the team conflicts were so severe that the contract could possibly be in jeopardy, and several key employees had threatened to resign if the inter-office problems were not resolved. Although team-building sessions had been scheduled in July, Gober requested assistance from human resources immediately, believing this was necessary because:

> [T]he continuing discord among the employees, the feeling that people were being undermined by other team members, the discussions I was having, the group meeting of telling people they had to be professional and they had to work with each other, it was not going to be tolerated to have any disrespect going on in the office, that people needed to communicate with each other clearly and effectively at a level where they could resolve the issues one on one and not harbor them and carry them forward where months later they are not still angry about something because it hadn't been cleared up. . . .The meeting between James [Caskey] and Emile [Greywoode]. It became apparent that someone needed to do a core assessment and come up with a way for interaction among the employees.

(Doc. #23-B) (alteration to original).

generalist, to Montgomery to interview the team members and to assess the office problems. Lee conducted a team assessment from June 8 through 11, 2009.  Upon arriving, Lee met with Gober and talked with her about the team environment.  Gober explained to Lee that Greywoode's demeanor and performance[18] had been declining to such an extent that it was causing total team disruption and frustration.  Gober also reported to Lee the tension between employees, specifically Greywoode, Caskey, and Ivison, and that Greywoode had made some complaints of discrimination.[19]

Following her meeting with Gober, Lee conducted interviews with each of the team members.  Lee also sent the team members a questionnaire asking them to rate one another and to provide examples of each members' strengths and weaknesses.  Sometime between June 8 and 10, 2009, Lee conducted her interview with Greywoode.  During their interview, Greywoode reported the hostile and disrespectful conduct he was receiving from Ivison and Caskey (specifically, the Topaz Signature Card comments, the "atrocious" comment, work and office assignments, and Caskey's all-caps email).  Greywoode also gave Lee a copy of the April 2009 "formal" written complaint he made to Gober.  Greywoode did not specifically mention "discrimination" during his interview with Lee, but he did complain of bigotry.  Lee did not ask Greywoode whether he had any concerns of discrimination or

---

[18] For example, Greywoode had not been meeting deadlines, which caused frustration among the team.

[19] Indeed, Shah testified that Gober told him the reason that Lee was coming in for the team assessment was because of Greywoode's discrimination complaints.  Lee also testified that she received a call from human resources to conduct the assessment because of office conflicts and a claim of possible discrimination.

bigotry.

Lee conducted interviews with the other team members as well. Each one complained in some way about Greywoode's performance, attitude, or communication abilities.[20] Several team members complained about Ivison as well.[21] On June 10, 2009, Lee conducted an outbrief with the team where she reviewed her findings and attempted to facilitate team communications.

After concluding the assessment, Lee reported to Kate Jacobson Sisson ("Sisson") and

---

[20] Specifically, a review of Lee's assessment summaries reflect the following complaints by SFMIS team members about Greywoode: (1) Ivison complained about Greywoode's "substandard performance," that he felt Greywoode got preferential treatment because of his race, that Greywoode's discrimination complaints made the workplace uncomfortable, and that Greywoode was rude and unable to work with the team; (2) Caskey complained that Greywoode gets hostile, raises his voice, and upsets people, that Greywoode confuses disagreements with disrespect, and that Greywoode cannot work with the team; (3) Jozwiak complained that Greywoode seems to be the source of a lot of tension, that he is not easy to get along with, and that Greywoode has constant issues; (4) Padgett complained that people were scared to confront Greywoode, that Greywoode was argumentative, that Greywoode points his finger at you if he is angry, and that it is easier not to engage in conversation with Greywoode; (5) Shah complained that Greywoode asks the same questions for help over and over, that Greywoode takes professional decisions personally, that Greywoode has no people skills, cannot provide solutions, and needs spoon-feeding, that other people do not want to work with Greywoode, that Greywoode does not interact well with the team and ends up having other people do his work, that Greywoode is placated because of his race, and that people accusing each other of racial discrimination makes things uncomfortable; (6) Silva complained that Greywoode was hard to work with and had multiple defects with his work; and (7) Paruchuri complained that Greywoode was hard to work with, called him fat, and was rude to his wife, that Greywoode yelled at him, and that Greywoode does not work well with the team. (Doc. #23-B.)

[21] Specifically, a review of Lee's assessment summaries reflect the following complaints by SFMIS team members about Ivison: (1) Jozwiak complained that Ivison is the unofficial lead and everyone goes to him; (2) Padgett complained that Ivison needs to communicate better and that he is similar to Greywoode; and (3) Silva complained that Ivison gossips, undermines her, and causes separation problems, that he always gets the final say, that he made racially discriminatory remarks to her, and that she is afraid of retaliation from Ivison. (Doc. #23-B.)

Tom Quigley ("Quigley") in human resources that Greywoode appeared to be the "root cause of disfunctionality of the team."  (Doc. #23-H.)  While Lee noted that a few team members had mentioned race as an issue with Greywoode,[22] Lee did not believe that race was the "actual problem."  (Doc. #23-H.)  Lee instead determined that Greywoode misused certain terminology, equating criticism with "bigotry" and disagreements with "disrespect."  (Doc. #23-H.)  Lee also determined that Greywoode does not understand the meaning of the word "bigotry" and may have a "misunderstanding of what he perceives as discrimination."  (Doc. #23-H.)  Lee further noted that there may be cultural differences among team members in methods of communication and body language.  Lee also reported a summary of her findings to Gober, explaining that she believed Greywoode, his work performance, and his inability to get along with the team members was the overriding problem in the office.[23]  However, it does not appear that Lee shared with Gober the specifics of her interviews with the team members.

_____

[22] Lee's assessment summaries reflect that a few employees complained about the tension caused by Greywoode's complaints of "discrimination" and that Shah mentioned that Greywoode complained about "bigotry."   Lee's assessment summaries also reflect that Ivison made racial remarks to Silva about Africans and Indians and that Silva perceived Ivison as a "racist."  However, Greywoode never mentioned "discrimination" in any of his complaints until after his termination from SAIC.  Moreover, there is no evidence that Greywoode ever complained about "bigotry" to Gober.  Finally, Silva subsequently testified that she was no longer sure whether she perceived Ivison as a "racist."

[23] It was also determined from the June 2009 team assessment that there were issues that needed to be addressed with Ivison, including his negative attitude and ability to work with the team. However, Gober determined that resolving this issue was second in priority to resolving the issues with Greywoode, as Greywoode's issues impacted production, performance, and the team's ability to meet their schedules and contract deadlines were quickly approaching.

Greywoode described Lee as "hostile" and took offense to Lee's use of the terms "our culture" and "your culture" in the outbrief meeting and her explanation that, in "our culture," we do not fold our arms in a meeting or use our hands when we talk.  Greywoode also was offended when Lee referred to the SFMIS team as "you people" or "your group," and when she told Greywoode that he should not assume that people are always talking about him because he is not important.

Finally, Lee noted that there was some possible race issues based on Silva's statements and reported perception that Ivison was a "racist."  Indeed, Silva testified that she reported to Lee that Ivison made a comment when considering hiring a black female that the black people would outnumber the white people and that could not happen; however, Silva clarified that Ivison based his dislike of the interviewee's appearance on the fact that she always had a scowl on her face, which he did not believe would translate well with the customer.[24]  Lee's interview notes further reflect that Silva claimed Ivison told her that it was his "mission" to get Greywoode fired[25] and that he also made the comment, "I guess all us white guys have to do all the work while the Africans and Indians sit on their asses."[26]

---

[24]  Silva admitted that she would not have hired this candidate herself either and further admitted that Ivison was responsible for hiring the only black female on the SFMIS team, which she believed Ivison considered his protégé.

[25]  Almost a year after Greywoode's termination, Silva reported to Gober Ivison's alleged statement about wanting to get Greywoode fired and not wanting to hire a black female because then the blacks would outnumber the whites, but Gober did not take action because "it seemed like hearsay a year and a half later when someone [Silva] is angry at someone else [Ivison]."  (Doc. #23-B.)

[26]  Ivison denies making any of these statements or remarks.

However, Silva later testified that Ivison "didn't discriminate in who it was, it just was whoever his focus was at the time." Silva claimed that Ivison generally dislikes all people and that he was rude to many team members other than Greywoode, including Cedrone, Caskey, and herself. No action was taken by SAIC to investigate Silva's reports to Lee or Greywoode's complaints of discrimination, and Lee was not asked to elaborate on her finding of possible racial issues among the team.

Lee's notes from her interview with Shah also reflect that Greywoode complained about "bigotry." It is unclear from the record when and how many times Greywoode complained about "bigotry." However, Ivison testified that before the June 2009 team assessment, Greywoode complained twice during a team meeting that everyone ganging up on him was "bigotry."[27]

After her meeting with Lee, Silva testified that she no longer knew whether she perceived Ivison as a "racist" and instead described him as a "puppet master" who liked to wreck havoc on others. (Doc. #23-J) ("I mean, it's not based on race."). Lee recommended that Gober inform Ivison that he needed to stop the "subversive practices" and "gossip sessions" immediately, and that "[r]acial remarks [would] not be tolerated." However, Gober did not recall Lee conveying to her the specifics of Silva's reports about Ivison's racial comments. Gober issued a written counseling to Ivison about his communications and interaction with the SFMIS team on July 20, 2009, which was after Greywoode's

---

[27] Gober did not recall Greywoode using the word "bigotry" in this team meeting.

termination.

**E.     Greywoode's Performance Evaluations, Counselings, and Termination**

Prior to the June 2009 team assessment, Greywoode had not been given a written discipline or negative performance evaluation; however, as early as 2007 and again in 2008, Gober received complaints from Greywoode's co-workers about his work performance, including Shah, Silva, and Caskey.  As a result, Gober had several informal discussions with Greywoode concerning his performance and ability to work with the team.  None of these discussions appear to have been documented.

Greywoode received performance evaluations from Nola in 2007 and Gober in 2008 and 2009.  In March 2007, Nola gave Greywoode a performance evaluation that ranked his overall performance as "Consistently Meets Expectations: Highly Successful Performance."[28] On that evaluation, it was noted that Greywoode "works well with all members of the SFMIS team and is well-liked by all team members" and that he is "effective in all forms of communication."  Greywoode was given a merit pay increase based on this performance evaluation.  In March 2008, Gober gave Greywoode a performance evaluation that ranked his overall performance as "Consistently Meets Expectations: Highly Successful Performance."  Greywoode was again described as having effective communication skills. Greywoode was given a merit pay increase based on this performance evaluation.

In March 2009, Gober gave Greywoode a performance evaluation that ranked his

---

[28]  The numerical rating assigned to an overall "Consistently Meets Expectations: Highly Successful Performance" evaluation is 3 on a scale of 5.

overall performance as "Frequently Exceeds Expectations: Exemplary Performance."[29]  This evaluation followed Shah's 2008 complaints about Greywoode's performance.  Shah and Gober met with Greywoode following Shah's complaints, discussed the issues, and gave him an informal improvement plan.  Gober testified that Greywoode's performance improved after this meeting, resulting in the positive March 2009 performance evaluation, which was written in January or February of 2009.  However, this evaluation specified "team building" and "inter-personal skills" as "areas for growth."  Greywoode received a merit pay increase based on this performance evaluation.  Greywoode testified that Gober's 2008 and 2009 performance evaluations were "fair," and Gober testified that the performance evaluations reflected her opinion as to Greywoode's performance at the time they were issued.

Gober testified that Greywoode's performance began to deteriorate after the March 2009 performance evaluation.  His work had moved from coding into testing, and errors in Greywoode's work were becoming more obvious and urgent with looming contract deadlines.  Coupling these issues with the results of the June 2009 team assessment, Gober determined that Greywoode's work performance and inability to work with the team warranted counseling.  As a result, on June 11, 2009, Gober issued Greywoode an inter-office memorandum that provided feedback on his job performance and outlined specific areas in which Greywoode needed to improve.[30]  Gober issued this memorandum based on

---

[29] The numerical rating assigned to an overall "Frequently Exceeds Expectations: Exemplary Performance" evaluation is 4 on a scale of 5.

[30] The areas in which Greywoode needed to improve, as identified in the counseling, were:

complaints that Greywoode caused delays in the team schedule, the results of the team assessment, the number of deficiency reports ("DR's") that were attributable to Greywoode, and the ongoing conflicts Greywoode had with team members.  Greywoode refused to sign this memorandum because he believed that the issues outlined therein were inaccurate and that he was already meeting all reasonable expectations.

After reviewing Greywoode's performance over a two-week period, Gober determined that Greywoode had not sufficiently improved in the areas outlined in the June

---

You must focus on the work assigned and perform at a level that meets the standards of a Senior Software Engineer and the schedule which you have participated in developing by providing input and approved for your area of work.

When recommending alternative solutions or providing input for design/development approaches, once the task lead determines a direction, you adhere to that direction and follow their technical guidance.

Work on your analysis skills, taking a more proactive role in analyzing a problem before seeking help.  Once you have discussed the issue with another team member, make sure you document what you have learn [sic] so as not to repeat the same questions when the problem arises again in the future.

You need to be professional to your co-workers at all times.  It is imperative that even if you do not have a good personal relationship with the people that you work with, this must not be evident to the office or the customer.  You must make every attempt possible to work with your co-workers in a professional manner and free from conflict. . .

Work to develop team interaction sills, being proactive to pitch in and get things done in the office that are not related to software development.

(Ex. 3, Doc. #23-A.)  This memorandum also noted that "[u]se of cell phones or Blackberries during meetings is inappropriate unless it is an emergency or you inform the group you must take a specific call if it occurs during the meeting before the meeting begins."  (Ex. 3, Doc. #23-A.)  Greywoode claims, however, that including this in the memorandum was a mistake because he never owned a Blackberry (although he did admittedly own a cell phone during his employment with SAIC and testified that it "maybe . . . went off" during a meeting).

11, 2009 inter-office memorandum.  Gober had also received complaints from Shah and Silva[31] that Greywoode's performance had not improved.  As a result, on June 25, 2009, Gober issued Greywoode a performance improvement plan ("PIP"), which outlined specific areas that needed immediate improvement and provided him 30 days to do so.  The PIP also warned that if Greywoode's performance deteriorated within the next 30 days, he would be subject to termination before the conclusion of the 30-day period.  Greywoode again refused to sign this document because he believed some of the issues outlined therein were inaccurate and based on false information from Caskey, and because he was already performing the tasks he deemed reasonable.  Greywoode complained to Gober that he believed he was issued the PIP in "retaliation for the discrimination, bias and other complaints [he] made."

On July 6, 2009, Greywoode met with Gober and Shah to discuss concerns with his performance.  They specifically discussed eight DR's attributed to Greywoode, two of which admittedly resulted from reworks done by Greywoode.  The remaining six were in

---

[31]  In response to a request from Gober to provide an update on the quality of work being performed by the team, Silva sent Gober on email on June 24, 2009, stating that the "work [Greywoode] has done has been riddled with problems, some of which I think stems from him misinterpreting the intent of the SRS or understanding it differently."  (Ex. 9, Doc. #23-B.)  Silva explained in her email that issues are difficult to communicate to Greywoode and that he needed to take time to prove the error to himself, while she did not experience that with Shah, Caskey, or Paruchuri.  (Ex. 9, Doc. #23-B.)  However, Silva testified that when she tested more work at a later date, Greywoode's errors were similar in amount to those of Shah and Paruchuri.  In other words, because Silva had been testing more of Greywoode's work at the time she sent the June 24, 2009 email, the number of errors attributable to him was more than the others.  Silva said she communicated this to Gober shortly before and after Greywoode was terminated, but this did not change the fact that Silva did not believe that Greywoode was as easy to communicate with as the other developers and that he always had to test the errors Silva found rather than take her word for it.

22

production[32] and needed to be corrected by Greywoode.  Greywoode again complained that these DR's were retaliation for his complaints about Ivison and Caskey.  Shortly after this meeting, Gober issued Greywoode another inter-office memorandum outlining the areas of needed improvement and providing feedback.  Greywoode refused to sign this memorandum as well because he believed  some of the issues outlined therein were inaccurate and because he was already complying with reasonable areas for improvement.

Between July 13 and 15, 2009, Gober made the decision to terminate Greywoode after consulting with Sisson, Lee, Quigley, and Shah; neither Ivison nor Caskey was involved in the decision to terminate Greywoode's employment.  In fact, Gober testified that Ivison had "no influence on [her] decisions who was hired and fired."  (Doc. #23-B.)  Gober based her decision to terminate Greywoode's employment on his failure to meet the skills and abilities of his position; continued input from Silva and Shah regarding Greywoode's failure to meet deadlines and his DR's, and the findings of the June 2009 team assessment.[33]  As a result, on July 15, 2009, Greywoode met with Gober and Sisson, and Sisson informed him that his employment was being terminated for poor performance.  Greywoode complained that "it was wrong for them to terminate my employment when [he] was the one who experienced the hostility, discrimination, and the impolite way of behavior," and he specifically mentioned Ivison and Caskey.  However, Greywoode admitted that he did not use the term

_____

[32] Greywoode argues that if a DR is "in production," that means that the defect was already in the software and, consequently, was not the result of a mistake by the software engineer.

[33] Gober testified that the first discussions of terminating Greywoode began after Lee's organizational assessment, and the decision was made around July 13, 2009.

"discrimination" in any of his oral or written complaints until after his termination from SAIC.  SAIC issued Greywoode a written "Notice of Layoff" that explained that he was terminated because he did "not have the skills/abilities necessary to be able to remain in your current position."

## IV.  DISCUSSION

Greywoode's claims in this case are asserted under Title VII and § 1981.[34]  Both of these statutes have the same requirements of proof and use the same analytical framework; therefore, for purposes of this Memorandum Opinion and Order, the Court will explicitly address Greywoode's Title VII claims with the understanding that this analysis applies equally to his § 1981 claims.  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  Applying this legal framework, the Court will now discuss Greywoode's claims in turn below.

### A.    Hostile Work Environment

Count I of Greywoode's Amended Complaint alleges a claim for hostile work environment based on his race and national origin.  (Doc. #9.)  Specifically, Greywoode claims he was subjected to severe and pervasive conduct based on his race and national origin that adversely affected the terms and conditions of his employment.  To establish a

---

[34]   Title VII prohibits discrimination in the terms, conditions, or privileges of one's employment based on "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  Coverage under § 1981 includes the making and enforcing of employment contracts.  42 U.S.C. § 1981(b).

claim for hostile work environment, Greywoode must establish that: (1) he belongs to a protected group; (2) he was subjected to unwelcomed harassment; (3) the harassment was based on his race or national origin; (4) the harassment was sufficiently severe or pervasive to alter the terms, conditions, or privileges of his employment; and (5) SAIC knew or should have known of the harassment and failed to intervene. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002). Based on the evidence presented in this case, the Court does not believe that Greywoode can establish a prima facie case of hostile work environment based on his race or national origin.

To begin, Greywoode cannot establish that the conduct of which he complains was *based on* or the *result of* his race or national origin, as opposed to some other permissible reason. The harassing conduct by Ivison and Caskey of which Greywoode complains includes: (1) in May 2009, Ivison shouted at Greywoode during a team meeting and called his work "atrocious;" (2) Ivison did not given Greywoode the task assignments he desired; (3) in early 2007, Ivison criticized Greywoode's use of aspect ratio in programming with, what Greywoode believed, was no knowledge or basis for this criticism; (4) at unspecified times and never in Greywoode's presence, Ivison mimicked Greywoode's African accent; (5) Caskey criticized Greywoode's design work; (6) Caskey spoke to and communicated with Greywoode in what Greywoode considered to be a disrespectful and discourteous manner; and (6) Caskey confronted Greywoode in a parking lot about Greywoode's behavior during a customer meeting. (Docs. #22, 26.) Despite Greywoode's arguments to the contrary, the Court is not convinced that any of these instances are traceable to Greywoode's race or

25

national origin.

While the Court is certain that there were personality conflicts and discourteous treatment by and between Greywoode, Ivison, and Caskey, as it appears that none of these individuals were particularly pleasant to work with, office squabbles and a lack of cohesiveness between team members does not demonstrate that Ivison and Caskey's purported harassing conduct towards Greywoode was *because of* his race or national origin. There is no evidence that any discriminatory comments, epithets, or insults were made directly to Greywoode or within his range of hearing.  While Greywoode points the Court to Ivison's mimicry of his African accent, which is the only instance of harassing conduct identified by Greywoode that could arguably be based on his race or national origin, Greywoode admits that this mimicry never occurred in his presence and that he did not learn of it until after his termination.[35]  Even if Ivison's mimicry was solely attributable to Greywoode's race or national origin, this conduct alone, unknown to Greywoode during his employment, does not transform the remaining harassing conduct of which Greywoode complains into harassment attributable to his race or national origin.

The same can be said for the other incidents of harassing conduct alleged by Greywoode.  There is no evidence that Ivison's critique of Greywoode's use of the aspect ratio in programming, his calling Greywoode's work "atrocious" in a team meeting, or his

---

[35]   Indeed, Ivison testified that he mimicked Greywoode's accent while joking about Greywoode asking at corporate events whether food or drink was free, not because he had a disdain for individuals of Greywoode's race or national origin.

not giving Greywoode the exact task assignments he desired, was done *because of* Greywoode's race or national origin.  There is likewise no evidence that Caskey's critique of Greywoode's design work, or his "disrespectful" manner of communicating with Greywoode, was *because of* Greywoode's race or national origin.  These comments and actions, while insensitive and perhaps unprofessional, do not contain any racial or ethnic statements, insults, or overtones; they evidence nothing more than disagreements and discord among co-workers, which is not actionable under Title VII.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) ("[d]iscourtesy and rudeness should not be confused with harassment") (internal quotations omitted)); *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998) (noting that not "every trivial personnel action that an irritable chip-on-the-shoulder employee did not like would form the basis of a discrimination suit") (internal quotations omitted)); *Sasser v. Ala. Dept. of Corrections*, 373 F. Supp. 2d 1276, 1290 (M.D. Ala. 2005) ("Title VII does not protect an employee from harsh criticism for [his] employer.") (internal quotations omitted)).  Finally, the confrontation between Caskey and Greywoode in the parking lot does not evidence harassment based on Greywoode's race or national origin.  Greywoode does not allege that Caskey ever made racial or ethnic statements or epithets to him during this dispute, or that this dispute was even attributable to his race or national origin.  This dispute further ended with Greywoode admittedly shouting at Caskey to leave him alone.  In short, none of the harassing conduct of which Greywoode complains is objectively discriminatory or attributable to his race or national origin.

Greywoode's reliance on the testimony of Silva is similarly unavailing.  While Silva

may have testified that she believed Ivison was a racist, that he had made racial remarks (outside of Greywoode's presence), and that he intended to get Greywoode fired, such testimony is speculation at best.  Moreover, Silva's testimony does not equate to evidence that Ivison's alleged harassing conduct towards Greywoode was because of his race or national origin.  *See id.* (noting that "a lack of racial sensitivity does not, alone, amount to actionable harassment") (internal quotations and citations omitted)).  Indeed, to make such a connection, the Court must assume that Silva's testimony about Ivison's character being "racist" (although Silva subsequently recanted this accusation and also testified that Ivison hired the only black female on the SFMIS team, whom she called Ivison's protégé) and that he wanted to get Greywoode fired[36] is tantamount to Ivison harassing Greywoode *because of* his race or national origin, rather than some other reason, such as performance issues, Greywoode's inability to work with others on the team, or the fact that there were personality conflicts between the two.  This is simply an assumption that is too attenuated for the Court to make.

While the Court recognizes that overt racial or national origin harassment is not necessary to establish a hostile work environment, Greywoode must still show that race or national origin was a substantial factor in his harassment and that if it were not for these

---

[36] While Silva's testimony that Ivison wanted to get Greywoode fired is speculation at best (as Ivison denies making any such statement), and hearsay at worst if Greywoode is offering this statement to prove that Ivison indeed wanted to get Greywoode fired rather than to prove Ivison's personal disdain for Greywoode, Silva further testified that Greywoode was not the only individual whom Ivison wanted to get fired; she claims he also wanted to get Cedrone (Caucasian) and herself (Caucasian) fired, further belying Greywoode's claim that Ivison's desire to get him fired was because of his race or national origin.

protected traits, he would have been treated differently. Even when viewing the facts in a light most favorable to Greywoode, the most he has shown is that he worked in an unpleasant and tense working environment as a result of interpersonal conflicts and rifts among his co-workers, which is not actionable under Title VII or § 1981. *See Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301–02 (11th Cir. 2007) (holding that Title VII does not prevent harassment alone).

Absent evidence that the harassing conduct at issue in this case was related to or because of Greywoode's race or national origin, his hostile work environment cannot survive. Still, even if there were such evidence in this case, Greywoode's hostile work environment claim would still fail as a matter of law because the conduct of which he complains was neither severe nor pervasive.[37] Indeed, to be actionable, harassing conduct must be sufficiently severe and pervasive to alter the terms, conditions, and privileges of

---

[37] *Compare Miller*, 277 F.3d at 1276 (finding that the severe and pervasive element had been met when employee was called "Julio," "Chico," "Taco," "Wetback," "Spic," and "Mexican Mother F-----" multiple times a day on a daily basis for at least a month), *with Cargo v. Ala. Bd. of Pardons and Parole Div.*, 391 Fed. App'x 753 (11th Cir. 2010) (categorizing as "petty office squabbles," as opposed to severe and pervasive harassment, a handful of incidents that occurred over a three to four year period), *and Smithers v. Wynne*, 319 Fed. App'x 755, 758 (11th Cir. 2008) (holding that "no reasonable person would find the undescribed office gossip, made in [the plaintiff's] absence, which he did not know about at the time, to be severe enough without more to constitute a hostile work environment"), *and Pizzini v. Napolitano*, No. 10-61498-CIV, 2012 WL 691539, at *1–3 (S.D. Fla. Jan. 3, 2012) (finding that employer's conduct, including criticisms of plaintiff's work performance and asking her not to speak in Spanish in the workplace, was not sufficiently severe or pervasive to establish a race/national origin hostile work environment claim where conflicts appeared to be related to the way the plaintiff carried out her job duties and interacted with her co-workers; the district court recognized that the Eleventh Circuit had affirmed summary judgment for an employer in hostile work environment cases that involved much more egregious conduct), *and Sasser*, 373 F. Supp. 2d at 1290 (holding that four incidents over a nine-month period did not qualify as severe or pervasive harassment).

one's employment.  This involves both a subjective and objective analysis; the conduct complained of must be subjectively perceived by the employee as sufficiently severe or pervasive to alter the terms, conditions, and privileges of employment, and this subjective perception must also be objectively reasonable.  *See Harris v. Forklift Sys.*, 510 U.S. 17, 21–22 (1993); *Mack v. St. Mobile Aerospace Engineering, Inc.*, 195 Fed. App'x 829, 834 (11th Cir. 2006).

There is no doubt that Greywoode subjectively believes that he was subjected to severe and pervasive harassment by Ivison and Caskey.  However, "[g]iven that any honest plaintiff subjectively perceives to have been victimized," the Court must ask whether a reasonable person in Greywoode's position would have felt the same way.  *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F. Supp. 2d 1254, 126 (M.D. Ala. 2001).  To determine this objective component, the Court must consider the "totality of the circumstances."  *Harris*, 510 U.S. at 23.  In applying this test, the Court looks to: (1) the frequency of the conduct; (2) its severity; (3) whether it was physically threatening or humiliating; and (4) whether it unreasonably interfered with Greywoode's work performance.  *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997).  "[N]o single factor is determinative, and either severity or pervasiveness can satisfy the element, if sufficient."  *Edwards v. Hyundai Motor Mfg. Ala., LLC*, 603 F. Supp. 2d 1336, 1348 (M.D. Ala. 2009) (internal quotations and citations omitted).  However, "teasing, offhand comments, and isolated incidents" do not constitute discriminatory changes in the terms, conditions, or privileges of employment.  *Faragher*, 524 U.S. at 778.  To the contrary, the workplace must be "permeated with

30

discriminatory intimidation, ridicule, and insult." *Miller*, 277 F.3d at 1276–77. These "standards for judging hostility are sufficiently demanding to ensure that [employment discrimination laws do] not become a general civility code." *Faragher*, 524 U.S. at 778.

As the Court previously noted, the parties have identified approximately seven instances of harassing conduct by Ivison and Caskey towards Greywoode that span a two-year period of his five years of employment with SAIC. The Court considers these instances to be isolated, not frequent. *Compare Cargo*, 391 Fed. App'x at 755 ("Five or six incidents over the course of three to four years is hardly frequent conduct."), *with Miller*, 277 F.3d at 1276 (holding that explicit racial name-calling, which occurred three to four times a day every day for a month, met the frequency requirement), *and Johnson v. Booker T. Washington Broad Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (holding that "roughly fifteen separate incidents of harassment over the course of four months" was sufficiently frequent). While Greywoode testified that Caskey "was constantly telling me that the design I made, the design decisions I made were wrong" and that Ivison "continuously told me that what I had done was wrong when he was not a software engineer," there is no evidence of harassing behavior other than the instances identified above. Simply saying that you endured harassing conduct on a "constant" or "continuous" basis, without any additional corroborating evidence, does not support an inference that such conduct did occur on a "frequent," as opposed to isolated, basis.

Still, even viewing the evidence in the light most favorable to Greywoode, as the Court must at this stage in the proceedings, and assuming that Caskey and Ivison did

31

continuously criticize Greywoode's design choices and work performance, there is no evidence that these criticisms or the other incidents of which Greywoode complains were attributable to his race or national origin, were severe, were physically threatening or humiliating, or unreasonably interfered with Greywoode's work performance. Employees do not have the right to work in an environment free from all critiques, no matter how unfounded. *See Sasser*, 373 F. Supp. 2d at 1290 ("Title VII does not protect an employee from harsh criticism for [his] employer.") (internal quotations omitted)). What the discrimination laws do protect employees from are discriminatory critiques dressed in business attire. Here, while Greywoode may have subjectively believed that Caskey and Ivison's constant critiquing of his design decisions and work performance was severe and pervasive harassment, the Court is not persuaded that a reasonable person in his position would make the same conclusion. *See Davis v. Town of Lake Park*, 245 F.3d 1232, 1342 (11th Cir. 2001) (recognizing that Title VII does not prohibit "everything that makes an employee unhappy").

There is also no evidence that the harassing conduct that Greywoode claims to have endured was physically threatening or humiliating. Indeed, the only incident that could be considered threatening was the parking lot confrontation with Caskey. However, there is evidence that this incident was provoked by Greywoode and concluded with Greywoode admittedly shouting at Caskey. Moreover, Greywoode never claims that Caskey threatened or humiliated him during this incident. In sum, the remainder of the harassing conduct of which Greywoode complains amounts to offensive utterances, which are not prohibited under

the law.  *See Harris*, 510 U.S. at 21 (recognizing that Title VII is only implicated in the case of a workplace that is "permeated with discriminatory intimidation, ridicule and insult," not where there is a "mere utterance of an . . . epithet which engenders offensive feelings in a[n] employee"); *Miller*, 277 F.3d at 1277 (noting that an employee overhearing occasional off-color remarks is not actionable conduct under Title VII).  Finally, there is no evidence that the harassing conduct of which Greywoode complains *unreasonably* interfered with his work performance.  Greywoode admitted that he was unaware of at least one incident of harassing conduct—Ivison's mimicry of his African accent—until after his termination.  Thus, it would have been impossible for this conduct to have interfered with his work performance.  Greywoode's becoming "disengaged" and not working well with his team does not demonstrate that severe and pervasive harassing conduct by Ivison or Caskey occurred, or that it *unreasonably* interfered with his work performance.  To the contrary, the undisputed evidence shows that Greywoode's discord with his team was the result of personality conflicts and rifts among the team members, not unlawful harassment.  Accordingly, SAIC's motion for summary judgment on Greywoode's hostile work environment claim is GRANTED.

**B.    Discrimination**

Count II of Greywoode's Amended Complaint alleges that he was terminated[38] not

---

[38]  While SAIC argues in its brief in support of its motion for summary judgment that Greywoode's various quibbles about work and office assignments do not constitute adverse employment actions sufficient to sustain a discrimination claim under Title VII, it does not appear that Greywoode is basing his discrimination claim on such conduct; rather, it appears from Greywoode's Amended Complaint and his brief in opposition to SAIC's motion for summary

because he failed to meet SAIC's performance expectations for a senior software engineer, but because of his race and national origin.  (Doc. #9.)  Title VII prohibits an employer from discriminating against an employee in the terms, conditions, or privileges of employment based on "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Because Greywoode alleges that he was terminated in a discriminatory manner based on his race and national origin, the Court will analyze this claim as a disparate treatment claim.

A plaintiff alleging a disparate treatment claim must show an intent to discriminate by the employer.  *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1313 (11th Cir. 1994). In cases like this one, where there is no direct evidence of discrimination,[39] a plaintiff may present circumstantial evidence from which an inference of intentional discrimination may be drawn.  *Id.*  The first step in a disparate treatment claim based on a theory of "pretext" and supported by circumstantial evidence is for the plaintiff to establish a prima facie case, which creates a rebuttable presumption of unlawful discrimination.  *Id.*  A defendant must then rebut this presumption by articulating a legitimate, non-discriminatory reason for its action. *Id.*  It is at this point that the burden shift backs to the plaintiff to establish that the non-discriminatory reason offered by the defendant is pretextual.  *Id.* at 1313–14.

The elements of a plaintiff's prima facie disparate treatment case were set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973), and *Texas Department of*

---

judgment that his discrimination claim is based solely on his termination.  (Docs. # 9, 22, & 26.)

[39]  Greywoode concedes that his discrimination claim is based on circumstantial evidence. (Doc. #26.)

*Community Affairs v. Burdine*, 450 U.S. 248 (1981).  Thus, in this case, to set out a prima facie case of disparate treatment, Greywoode must show that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) SAIC treated similarly situated employees outside his class more favorably that he was treated; and (4) he was qualified to do the job. *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006).  "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Sasser v. Ala. Dept. of Corrections*, 373 F. Supp. 2d 1276, 1285 (M.D. Ala. 2005) (internal quotations omitted).  Moreover, "[t]he methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

The parties do not dispute that Greywoode is a member of a protected class, that he suffered an adverse employment action, and that he was qualified for his job.  What SAIC does argue is that Greywoode has failed to satisfy the third element of his prima facie case because he has failed to show that he was treated less favorably than a similarly situated employee.  The Court agrees that Greywoode has failed to show that he was treated less favorably than a similarly situated employee; indeed, in his brief in opposition to SAIC's summary judgment motion, Greywoode makes no effort to rebut SAIC's contention that he has failed to identify or present any evidence of employees who were similarly situated to him but treated more favorably by SAIC.  In actuality, the evidence shows that SAIC terminated a Caucasian employee (Cedrone) for the same reason as Greywoode—poor

performance.

Recognizing this deficiency, Greywoode argues that his failure to identify any comparator evidence does not preclude his termination claim.  Indeed, courts in this circuit have found, in certain circumstances, that the absence of a similarly situated employee does not automatically defeat a plaintiff's prima facie case if there is evidence from which an inference of discrimination could be found.  *See Hunter v. Mobis Ala., LLC*, 559 F. Supp. 2d 1247, 1255 (M.D. Ala. 2008) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1563 (11th Cir. 1997)).  "In other words, the lack of a similarly situated comparator should not defeat [a plaintiff's] prima facie case when there is otherwise *sufficient* circumstantial evidence of discriminatory intent."  *Id.* at 1257 (emphasis added).  Thus, Greywoode can meet his prima facie burden *if* he presented sufficient evidence to permit a reasonable trier of fact to infer that his termination was based on discriminatory intent.  *Id.*

Greywoode points to *Hunter v. Mobis Alabama, LLC*, 559 F. Supp. 2d 1247 (M.D. Ala. 2008) in an effort to establish a prima facie case of discriminatory termination absent sufficient comparator evidence.  *Hunter* involved an employee who claimed she had been terminated because of her pregnancy in violation of the Pregnancy Discrimination Act.  Although the plaintiff did not present comparator evidence, the district court, in denying summary judgment, held that the plaintiff had met her prima facie burden by presenting sufficient evidence from which a reasonable juror could infer that the plaintiff's termination was based on discriminatory intent.  *Id.* at 1257.  The district court found that such an inference could exist based on the following evidence: (1) an email from the plaintiff's

36

supervisor, Jaekwang Kim ("Kim"), who had the authority to hire or fire her, to the human resources manager that "I do not want to take care of [the plaintiff] anymore . . . I need your help to terminate her;" (2) Kim's own testimony that when he decided to terminate the plaintiff, he asked the plaintiff's immediate supervisor if the company had a policy or something in the handbook that he could use to terminate the plaintiff for "bad tardiness or bad attendance;" (3) in the plaintiff's termination meeting, the plaintiff asked Kim why his demeanor towards her had changed after she informed him of her pregnancy, to which Kim responded: "I can't afford to take care of an employee like you;" (4) testimony from the plaintiff's immediate supervisor that she told the plaintiff not to tell Kim of her pregnancy because a previous employee "was fired in regards to being pregnant;" (5) evidence that other pregnant individuals had been fired and that other employees told the plaintiff not to tell Kim about her pregnancy because other pregnant individuals had been fired; and (6) evidence that Kim did not bother to familiarize himself with or enforce the company's attendance policy (the plaintiff was hired despite having absences during her probationary period, when she was not pregnant) until he needed to terminate the plaintiff based on tardiness and absences. *Id.* at 1257–58.

The evidence that Greywoode has presented to the Court from which he claims an inference of discrimination could be made is undeniably more tenuous than that presented to the district court in *Hunter*. To meet his prima facie burden, Greywoode points the Court to Silva's testimony that Ivison: (1) wanted to have Greywoode fired; (2) mimicked Greywoode's African accent; (3) made a derogatory remark about "Africans"; and (4)

37

expressed racial bias in a hiring decision.  In the Court's opinion, this evidence is simply insufficient to allow a reasonable juror to infer that Greywoode's termination was based on his race or national origin.  Unlike in *Hunter*, there is no evidence that the undisputed decision-maker in this case—Gober—asked human resources for help to terminate Greywoode or whether there was any policy or something in the handbook that could essentially serve as a "cover-up" basis for a discriminatory termination.  Also, there is no evidence that Gober made any statements to Greywoode even arguably attributable to his race or national origin, as opposed to Kim's statement to the *Hunter* plaintiff that he could not "afford to take care of an employee like you," which was implicitly attributable to her pregnancy.  Finally, there is no evidence that SAIC routinely terminated individuals of similar race or national origin as Greywoode or that Gober limited her disciplines or terminations for poor performance only to individuals of similar race or national origin as Greywoode.  In short, inferring a discriminatory motive based on this evidence is an inference that the Court simply cannot make.

Indeed, the relevant issue with respect to Greywoode's discriminatory termination claim, as SAIC correctly pointed out, is Gober's motive—not Ivison's.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) ("Our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.").  There is no dispute that Gober made the decision to terminate Greywoode's employment.  While Greywoode attempts to make a "cat's paw" argument, claiming that Gober "effectively became Mr. Ivison's instrument of discrimination," such an argument falls short here given

the absence of any evidence showing that Ivison had any effect whatsoever on Gober's decision to terminate Greywoode. Gober testified that Ivison "had no influence on my decisions who was hired and fired" and that Ivison's "input carried very little weight with me." (Doc. #23-B.) There is also no evidence demonstrating that Gober had any discriminatory animus based on Greywoode's race or national origin. To the contrary, the evidence shows that most team members felt that Gober placated Greywoode and was protective of him.

The evidence further suggests that Gober did not have knowledge of the actions on which Greywoode relies to establish an inference of discrimination. There is no evidence demonstrating that Gober had knowledge of Ivison's mimicry of Greywoode's African accent. There is also no evidence that Gober had knowledge that Ivison was trying to get Greywoode fired. Rather, Silva did not report to Gober that Ivison allegedly said he wanted to get Greywoode fired until a year after Greywoode's termination, at which time Silva also told Gober that she believed Ivison wanted to get her (Caucasian) and Cedrone (Caucasian) fired as well.[40] Moreover, Gober testified that Lee conveyed to her after the June 2009 team assessment that the entire team felt Greywoode needed to go, not just Ivison. There is also no evidence that Gober had any knowledge of a derogatory remark Ivison made about "Africans" or that he had expressed a racial bias to Silva during an interview of a black female.

---

[40] This further belies Greywoode's claim that any animosity Ivison had towards him, or Ivison's purported desire to get him fired, was based on his race or national origin.

Greywoode's argument that an inference of discrimination could stem from Gober purportedly permitting Ivison's conduct and refusing to hold him accountable for his performance shortcomings is similarly unavailing. Even when viewing the evidence in a light most favorable to Greywoode, the evidence shows that Gober rebuked Ivison for the "atrocious" comment and had him apologize to Greywoode. Gober also made Greywoode lead Java programmer in early 2009 after he complained that Ivison was not assigning him the type of tasks he wanted. Finally, while Gober counseled Ivison for his communication methods after Greywoode's termination, there is no evidence that Gober did so because of Greywoode's race or national origin; rather, Gober determined that Greywoode's performance issues were more pressing and serious than Ivison's, which was a business decision within her parameters to make. Thus, SAIC's motion for summary judgment on Greywoode's discrimination claim is GRANTED.

## C.   Retaliation

Count III of Greywoode's Amended Complaint alleges that Greywoode engaged in protected activity and that, after doing so, SAIC subjected him to adverse employment actions, including discipline, a performance improvement plan ("PIP"), and ultimately termination. (Doc. #9.) Title VII prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Under the *McDonnell Douglas* framework, a plaintiff has the initial burden of

establishing a prima facie case of unlawful discrimination by a preponderance of the evidence. *See McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). "'As with a discriminatory treatment claim, a plaintiff alleging a retaliation claim under Title VII must begin by establishing a prima facie case.'" *Sasser*, 373 F. Supp. 2d at 1286 (quoting *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995)).

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) he engaged in statutorily protected activity; (2) he suffered adverse employment action; and (3) a causal link exists between the adverse employment action and protected activity. *Brush v. Sears Holdings Corp.*, 466 Fed. App'x 781, 786 (11th Cir. 2012). SAIC does not dispute that Greywoode's discipline and termination are adverse employment actions; however, it does dispute whether Greywoode engaged in statutorily protected activity and, if he did, whether there is a sufficient causal link between this activity and Greywoode's discipline and ultimate termination by SAIC.

With respect to the "protected activity" element of Greywoode's retaliation claim, SAIC focuses on Greywoode's April 29, 2009 "formal complaint," arguing that it does not qualify as "statutorily protected activity" because it did not mention race or national origin discrimination and instead focuses on Caskey's hostile email and the fact that Greywoode did not get an office assignment he desired. SAIC points the Court to cases in which activities were not considered to be statutorily protected because the plaintiffs were complaining internally about emails they found offensive and the complaints did not specifically mention race, racial discrimination or harassment, or that the employer was

engaging in an unlawful employment practice.  *See Saffold v. Special Counsel, Inc.*, 147 Fed. App'x 949, 951 (11th Cir. 2005); *Brown v. City of Opelika*, 211 Fed. App'x 862, 864 (11th Cir. 2006).

However, while the Court agrees that Greywoode's April 29, 2009 "formal complaint," which complained about quibbles over an office assignment and an email from Caskey that Greywoode found offensive because of its tone, this is not the only complaint that Greywoode made during his employment with SAIC.  Indeed, there is evidence that Greywoode complained about "bigotry" during a staff meeting, that his complaints about discrimination led to the June 2009 team assessment, that Greywoode complained about bigotry to Lee during their interview in early June 2009, that Greywoode complained to Gober on June 25, 2009, that she issued him the PIP in "retaliation for the discrimination, bias and other complaints I've made," and that Greywoode complained to Gober on July 6, 2009, that SAIC was trying to fabricate fault with his work to retaliate against him for his complaints.  Taking this evidence in the light most favorable to Greywoode, the Court believes that Greywoode had a subjective, good-faith believe that SAIC was engaged in unlawful employment practices and that SAIC knew of this belief in June and July 2009.

Having established the "protected activity" element of his prima facie retaliation claim, Greywoode must also prove a causal connection between his protected activity and his termination.  "The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  *Sasser*, 373 F.3d at 1287 (internal quotations and citations omitted).  "One

42

common method of establishing the causal link element is close temporal proximity between the adverse employment action and the protected activity.  Of course, this is not the sole means of establishing the causal link element; rather it is merely the most commonly used approach."  *Walton v. Neptune Tech. Group, Inc.*, No. 2:08-cv-5-MEF, 2009 WL 3379912, at *15 (M.D. Ala. Oct. 20, 2009).  The undisputed evidence in this case shows that Gober began discussing Greywoode's termination and issued him his first written disciplinary action[41] after the June 2009 team assessment during which he complained about bigotry.  A few weeks later, Gober issued Greywoode a PIP, and Greywoode complained to Gober that he believed he was issued the PIP in "retaliation for the discrimination, bias and other complaints I've made."  A few weeks later, after a meeting with Gober and Shah to discuss his work performance, Greywoode complained that he believed SAIC was trying to fabricate fault with his work in retaliation for complaints he made about Ivison and Caskey.  In sum, the close temporal proximity between Greywoode's termination and his complaints in June and July 2009 of discrimination and retaliation is sufficient circumstantial evidence to establish the "causal connection" element of his prima facie retaliation claim.

Once a prima facie case is established, the burden shifts to the defendant to rebut the presumption of retaliation by producing a legitimate, non-discriminatory reason for the adverse employment action.  If the defendant offers a legitimate, non-discriminatory reason, then the   presumption of retaliation disappears, and the plaintiff must show that the

---

[41] However, Gober testified that she had orally and informally counseled Greywoode about his performance before the June 2009 team assessment.

employer's proffered reason for taking the adverse employment action was actually a pretext for unlawful retaliatory conduct. *Brown*, 211 Fed. App'x at 864. Pretext can be demonstrated through evidence showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's proffered legitimate reason for termination. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005).

SAIC has offered a legitimate, non-discriminatory reason for Greywoode's termination—his poor work performance. As such, the burden shifts to Greywoode to present sufficient evidence from which a reasonable juror could conclude that SAIC's proffered reason for his termination was pretext for an unlawful, retaliatory motive. The Court believes that Greywoode has met this burden. "'[F]or an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory.'" *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) (emphasis omitted)). In the Court's opinion, Greywoode has presented sufficient evidence calling into question whether Gober believed in good faith that Greywoode's performance was unsatisfactory and warranted termination, or whether this reason was simply proffered to disguise the fact that Greywoode was terminated in retaliation for his complaints of discrimination.

First, there is evidence that Greywoode did not receive a written disciplinary action or negative performance evaluation until after the June 2009 team assessment, which

44

transpired, at least in part, because of Greywoode's discrimination complaints. Indeed, Greywoode's performance evaluations from March 2007, March 2008, and March 2009, were positive, with Greywoode receiving his highest marking of "exemplary" performance in March 2009, just a few months before his June 2009 discrimination complaints. While a positive performance evaluation followed by a negative performance evaluation alone cannot establish pretext, when considering Greywoode's documented positive work history with the fact that he received his first written counselings, a PIP, and was eventually terminated within a few months of his June 2009 discrimination complaints, the Court believes a reasonable juror could infer that SAIC's marked reassessment of Greywoode's performance was pretext for a retaliatory motive.

SAIC contends that the change in Greywoode's performance evaluations resulted from his errors and performance deficiencies becoming much more obvious as contract deadlines grew closer in the summer months of 2009, and that this non-retaliatory explanation precludes Greywoode from establishing pretext. Viewing the evidence in the light most favorable to Greywoode, the Court cannot agree. Indeed, Greywoode has presented evidence that Gober agreed that some issues identified in his performance counselings were not correct and that Shah agreed that several of the DR's listed as attributable to Greywoode during a performance counseling were in fact not. Moreover, there is evidence that, after Silva discovered that her June 24, 2009 email to Gober was not

a completely accurate assessment of Greywoode's performance,[42] Silva explained this to Gober before Greywoode's termination.   Yet, Gober still admittedly relied on this information when terminating Greywoode.   From this, the Court believes that reasonable jurors could differ as to whether Gober believed in good faith that Greywoode's performance was unsatisfactory and warranted termination.

Greywoode also relies on his denial of any performance deficiencies in an effort to establish pretext.   More specifically, Greywoode argues that his denial of a concrete fact— in this case, his performance deficiencies—requires the denial of summary judgment.   In response, SAIC argues that Greywoode's differing opinion of his performance does not create a dispute of fact, and the Court agrees.   Unvariably, a plaintiff terminated for poor performance will almost always have a differing opinion as to his or her performance abilities than that of the former employer, and Greywoode is no different.   Indeed, the evidence shows that Greywoode has an unwavering high opinion of himself and his work performance.   However, if every plaintiff who was terminated for poor performance was allowed to create a factual issue as to pretext by simply disagreeing with the employer's opinion as to his work performance, and offering his own opinion and evaluation instead, then performance-based terminations would always move past summary judgment on the issue of pretext.   Nevertheless, when coupling Greywoode's denial of performance issues

---

[42] Specifically, Silva testified that at the time she sent the June 24, 2011 email to Gober, she had tested approximately 80-90% of Greywoode's work and, therefore, found most errors in his work because she had tested it almost exclusively.  When the testing was complete, Silva realized that Greywoode's errors were similar in amount to those of the other developers.

with the changes in his performance evaluations, the temporal proximity between his June and July 2009 discrimination complaints and his termination, and evidence that Gober had knowledge that some of the performance deficiencies on which she relied to terminate Greywoode were not accurate, the Court believes that a reasonable juror could find pretext sufficient to warrant the denial of summary judgment on Greywoode's retaliation claim. Accordingly, SAIC's motion for summary judgment on Greywoode's retaliation claim is DENIED.

## V.  CONCLUSION

For the reasons stated above, it is hereby ORDERED as follows:

1.      Defendant SAIC's Motion for Summary Judgment (Doc. #21) is hereby GRANTED  as to Plaintiff's hostile work environment claim under Title VII and § 1981 (Count I), and those claims are DISMISSED with PREJUDICE;

2.      Defendant SAIC's Motion for Summary Judgment (Doc. #21) is hereby GRANTED as to Plaintiff's discrimination claim under Title VII and § 1981 (Count II), and those claims are DISMISSED with PREJUDICE; and

3.      Defendant SAIC's Motion for Summary Judgment (Doc. #21) is hereby DENIED as to Plaintiff's retaliation claim under Title VII and § 1981 (Count III).

DONE this the 9th day of May, 2013.

_____
      /s Mark E. Fuller
   UNITED STATES DISTRICT JUDGE

47